**MORROW NI LLP**
Xinlin Li Morrow (SBN 281707)
xinlin@moni.law
Ryan McMenamin (*Pro Hac Vice Forthcoming*)
ryan@moni.law
3333 Michelson Dr Ste 300
Irvine, CA 92612
Phone: (213) 282-8166

*Attorneys for Last Brand, Inc., d/b/a Quince*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| LAST BRAND, INC. D/B/A QUINCE, A DELAWARE CORPORATION, | Case No. 26-cv-1540 |
| *Plaintiff,* | **COMPLAINT FOR** |
| vs. | **VIOLATION OF THE SHERMAN ACT (ATTEMPTED MONOPOLIZATION), 15 U.S.C. § 2** |
| DECKERS OUTDOOR CORPORATION, A DELAWARE CORPORATION, | |
| *Defendant.* | |

**COMPLAINT**

CASE NO. 26-CV-1540

## I.    SUMMARY OF THE CASE

1.    Last Brand, Inc., d/b/a Quince ("Quince"), brings this action under Section 2 of the Sherman Act against Deckers Outdoor Corporation ("Deckers"), the company behind the UGG® brand. Deckers uses hundreds of sham trade dress lawsuits asserting unprotectable, unregistered product-design trade dresses as an exclusionary weapon to block competitors and maintain its dominance in the United States market for sheepskin- and shearling-lined casual footwear ("Sheepskin Casual Footwear Market").

2.    Deckers operates a litigation assembly line. It churns out template complaints asserting exclusive rights over basic and unprotectable product features: suede exteriors, shearling linings, rounded toes, and thick soles. It reuses identical feature lists in lawsuits against dozens of competitors, changing only the defendant's name and product.

3.    Each complaint repeats the same conclusory labels, such as "unique," "inherently distinctive,"[1] and "non-functional." Deckers' template complaints repeat the same paragraphs verbatim across unrelated actions, including identical "Oprah's Favorite Things" language and identical "commercial success" narratives, notwithstanding that the asserted trade dresses are based on different products. These paragraphs appear without material variation in complaints filed years apart, against different defendants, and asserting different footwear designs. Since 2012, Deckers has recycled a standardized "Oprah's Favorite Things" paragraph, including the statement that Oprah "LOOOOOVES her UGG Boots," based on a television episode filmed in the year 2000, across at least 267 separate pleadings. *See, e.g.*, Ex. 1 (Lex Machina docket report for cases filed by Deckers Outdoor Corporation identifying 267 pleadings containing the quoted "Oprah's Favorite Things" language).

---

[1] The law is clear that product design trade dress is "not inherently distinctive." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212-13 (2000) ("Competition is deterred, however, not merely by successful suit but by the plausible threat of successful suit, and given the unlikelihood of inherently source-identifying design, the game of allowing suit based upon alleged inherent distinctiveness seems to us not worth the candle.").

---

**COMPLAINT** - 1

CASE NO. 26-CV-1540

4.      Deckers' template-driven pleadings are engineered to survive early dismissal and force competitors into costly discovery before courts examine whether the claimed trade dress is legally protectable. Courts rarely scrutinize whether the feature lists actually identify a source or are legally protectable at the pleading stage. These defects usually escape notice until late in the process.

5.      But they did not escape notice in *Deckers Outdoor Corp. v. It's Friday, Inc.*, No. 1:20-cv-10602. There, even after default, the magistrate judge examined Deckers' trade dress pleading and found it legally insufficient, describing a "laundry list" of features "with no explanation" of distinctiveness and identifying elements that were "quite obviously functional in the traditional sense." *Deckers Outdoor Corp. v. It's Friday, Inc.*, No. 20-CV-10602 (VSB) (BCM), 2024 WL 5481211, at *6 (S.D.N.Y. Oct. 31, 2024), *report and recommendation adopted*, No. 20-CV-10602 (VSB) (BCM), 2025 WL 886882 (S.D.N.Y. Mar. 21, 2025). The court recommended dismissal of the trade dress claims despite the absence of opposition.

6.      Deckers' feature lists function as one-sided property claims. They tell courts what Deckers wants to own, force competitors to redesign, and warn retailers that selling products with these features risks an injunction.

7.      Deckers times its lawsuits for maximum disruption, often filing during the peak selling season for winter footwear, which drives the highest percentage of annual category sales. By October, competitors have already invested in inventory and marketing. Faced with a lawsuit, they must either defend under threat or abandon their products.

8.      When defendants challenge the claimed trade dress's functionality, genericness, or distinctiveness (the "protectability prerequisites"), Deckers reflexively argues that these core issues must be deferred for later fact-finding. This tactic further delays resolution and increases litigation expense. *See, e.g.,* Ex. 2 (Pl.'s Opp'n to Mot. to Dismiss at 4-8, *Deckers v. A1VPG68YJ5DJCK, et al.*, No. 1:25-cv-09863 at ECF No. 43).

9. The scheme was exposed on October 2, 2025, when this Court, in *Deckers v. Last Brand*, Inc. (the "*Quince* Action"), became the first to evaluate Deckers' product-design trade dress claims after full discovery. The Court found the Classic Ultra Mini boot and Tasman slipper trade dresses generic and unprotectable. Ex. 3 (Order Granting Partial Summary Judgment at 12–15, *Quince* Action, ECF No. 203, filed Oct. 2, 2025). The decision echoed what the USPTO had already told Deckers. Consumers associate features such as "brushed suede exterior" and "rounded toe" with the UGG® name, not a particular design.

10. Deckers' response to *Quince* ruling revealed its true strategy. After the Court declared the Tasman trade dress generic, Deckers immediately filed dozens of new lawsuits recycling the same invalidated five-feature definition. These complaints used the same checklist, repeated the "unique" and "inherently distinctive" claims, and included the same unregistered trade dress already rejected as generic. *See* Ex. 4 (Post-*Quince* Lawsuits from Lex Machina Search); *see, e.g.,* Ex. 5 (Complaint, *Deckers v. CLIPP'LI EVSHINE et al.,* Case No. 1:26-cv-01052 (N.D. Ill.), filed Jan. 29, 2026), ¶ 17.

11. By asserting unprotectable, unregistered product design trade dresses at scale, Deckers seeks to over-extend the protection of trade dress. It seeks to control the entire category of goods in the Sheepskin Casual Footwear Market.

12. The Supreme Court warned against precisely this strategy. In *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001), the Court "caution[ed] against misuse or overextension of trade dress," particularly product design trade dress which "almost invariably serves purposes other than source identification." (citation and internal quotations omitted.) Indeed, the Supreme Court stated that "unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying" and that "copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *Id.* (citation omitted.)

13.     Trademark rights in the "UGG" name and logo and design patent rights alone could not give Deckers control over the category. So Deckers pivoted from enforcing its registered word and logo marks and design patents to asserting unregistered product-design trade dress using ordinary footwear-construction descriptors. Deckers filed its first Bailey Button trade dress complaint on January 8, 2014, sixteen days after a court permitted a defendant to challenge the validity of design patents that covered the Bailey Button boot. The timing was not coincidental. Common law trade dress rights require no registration and shift the burden to defendants to disprove protectability through expensive discovery.

14.     Deckers then rolled out product-specific templates for the Classic Ultra Mini boots, Tasman slippers, Tazz clogs, Neumel chukkas, and Fluff Yeah slides, and others. Each template claimed trade dress in ordinary footwear-construction descriptors common across the product category. Each recycled the same "UGG Classic" brand-fame narrative to manufacture distinctiveness. Each generated dozens of settlements that Deckers packaged as validation for the next enforcement round.

15.     Deckers received repeated and explicit notices that these claims lacked merit. The USPTO rejected registration of the Classic UGG boot design as trade dress twice, in 2015 and 2018. The agency stated that Deckers' advertising did not highlight the design itself but promoted the overall brand. It explained that the claimed features were so common in the marketplace that they could not serve as source identifiers. Federal courts held Deckers' "classic boot styling" language was too vague to provide notice. Even Deckers' own corporate witness could not define key terms in the feature lists. Nonetheless, Deckers persisted in filing the same boilerplate complaints.

16.     Deckers still uses "classic suede boot styling made famous by the UGG® brand" as the first element for its Bailey Button trade dress definition, the same element that a court held was "too general to give Defendants notice." *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSX), 2015 WL 12731929, at *3 (C.D. Cal. May 8,

2015). Deckers still conflates brand-level goodwill with product-design distinctiveness. And Deckers still sues competitors 2 to 4 years after launching new products, before trade dress could plausibly achieve secondary meaning independent of brand fame.

17.    The Bailey Button campaign continues today. Deckers holds approximately 70 permanent injunctions tied to Bailey Button trade dress. The underlying design patents expired in 2023 and 2024. Deckers no longer sells the Bailey Button boot on its website. Yet Deckers filed new Bailey Button trade dress claims as recently as May 2025. The product is gone, the patents have lapsed, but the market restraints remain in force.

18.    Deckers dominates the Sheepskin Casual Footwear Market and uses litigation to maintain that dominance. On information and belief, Deckers accounts for the majority of U.S. sheepskin casual footwear sales.

19.    Quince competes by offering high-quality sheepskin casual footwear at radically lower prices. These products perform the same function as UGG products priced about twice as high. Deckers sued Quince claiming unregistered product design trade dress rights, which the court ultimately ruled as generic and unprotectable. The litigation served its purpose even before reaching a final decision. Quince withdrew products, altered designs, and incurred substantial litigation expense. The company missed peak sales seasons for the products at issue while fighting the lawsuit.

20.    This pattern exemplifies the anticompetitive effect of Deckers' strategy: Deckers does not need to win each case. Filing successive lawsuits disrupts competitors during critical sales periods. After the season, Deckers often settles or dismisses the case. It then cites the legal action as enforcement in subsequent disputes. Deckers repeats this process with dozens of defendants each year.

21.    Quince seeks treble damages for defense costs, lost sales, and forced product redesign costs, plus injunctive relief stopping Deckers from filing trade dress suits asserting claims this Court held unprotectable, from extracting settlement "acknowledgments" without

proving validity, and from weaponizing sham litigation to eliminate value-priced competition from the Sheepskin Casual Footwear market.

## II.     PARTIES

22.     Quince is a Delaware corporation and online retailer headquartered in San Francisco, California. Quince competes directly with Deckers in the Sheepskin Casual Footwear Market by offering quality sheepskin and shearling-lined casual footwear to U.S. consumers at value-oriented price points. Deckers' trade dress campaign has directly targeted and restrained Quince's ability to sell these products through the *Quince* Action and ongoing enforcement threats.

23.     Deckers is a Delaware corporation with its principal place of business in Goleta, California. Deckers is a multi-billion-dollar corporation that owns the UGG brand and distributes UGG-branded products globally. Deckers holds substantial market power in the Sheepskin Casual Footwear Market. Through the UGG brand, Deckers controls key retail and wholesale placements, commands premium pricing, and has positioned UGG as the dominant brand in the category. Deckers uses its trade dress enforcement campaign to prevent competitors from offering value-priced alternatives using commonplace design features, thereby maintaining supracompetitive prices and excluding competition.

## III.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under the Sherman Act, 15 U.S.C. § 2. This Court also has jurisdiction to grant injunctive relief under 15 U.S.C. § 26.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because Deckers resides in this District and a substantial part of the events giving rise to the claims occurred in this District, including the direction of enforcement threats into this District and the disruption of Quince's business operations within this District.

26.     This Court has personal jurisdiction over Deckers because Deckers conducts substantial business in this District and engaged in the challenged conduct here. Deckers previously invoked this Court's jurisdiction and venue in the *Quince* Action to prosecute the trade dress claims that form the challenged conduct here, and Deckers continues to direct enforcement threats and lawsuits into this District that affect Quince's ability to sell sheepskin-and shearling-lined casual footwear.

## IV.    FACTUAL BACKGROUND OF DECKERS' ANTICOMPETITIVE TRADE DRESS CAMPAIGN

### A.     The "Classic" Carryover Tactic

27.     Deckers uses the decades-old "Classic" boot as the brand's anchor and carries that reputation into lawsuits about different, later-released products. In cases asserting newer, product-specific, unregistered product-design trade dresses, including lower-cut boots, slippers, and other later designs, Deckers invokes the Classic boot's history and cultural prominence to imply that consumers will treat those newer designs as source-identifying. That move relies on UGG's general brand fame to support distinctiveness for a separate design, instead of alleging facts showing consumers recognize the particular elements of the newer design as indicating the source. Deckers then pairs the Classic narrative with ordinary footwear-construction descriptors and asks the Court to infer distinctiveness from the brand's reputation rather than from design-specific consumer perception.

28.     Deckers deploys the same "Classic" carryover tactic across the portfolio, including products far removed from any Classic-boot lineage, such as slip-ons and sandals, and in some matters it alleges source association for newly introduced designs in a short sales window.

### B.     The Standardized Template and File-First Strategy

29.     Deckers' complaints follow a reusable template: (1) a product-specific trade dress definition using ordinary footwear-construction descriptors, (2) the "UGG Classic"

heritage narrative, and (3) conclusory labels ("inherently distinctive," "non-functional") without design-specific consumer perception allegations. The template is built to survive the pleading stage and to push the real fight into discovery and experts. On information and belief, Deckers usually files suit without a prior demand letter, packaging the complaint with immediate injunction demands and accusations aimed at sales channels.

30.     Contrary to settled Supreme Court guidance on product design trade dress, Deckers repeatedly alleges, in nearly identical language, that the asserted trade dress "is neither essential to its use or purpose, nor does it affect the cost or quality" of the product, that "numerous other designs" are "equally feasible and efficient," and that the claimed combination provides "no cost" or "utilitarian advantages" and "serve[s] only" as a source identifier. Ex. 6 (Compl., *Deckers Outdoor Corp. v. Costco Wholesale Corp.*, No. 2:23-cv-09855 (C.D. Cal. filed Nov. 20, 2023), ECF No. 1), at ¶¶ 20–22; *cf.*, *e.g.*, *Samara Bros.*, 529 U.S. at 213 ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.").

31.     On distinctiveness, Deckers' template recites UGG brand fame, advertising spend, celebrity visibility, and sales volume, then treats these brand-level facts as proof that consumers view the specific product design as a source identifier. Across different asserted trade dresses, Deckers repeats the same story that the design is "one of the most well-recognized and commercially successful styles" of UGG footwear and recycles the same Classic-boot history narrative, including "Oprah's Favorite Things" in 2000 and other celebrity and media references to imply source association for later product-specific trade dress definitions alleged in the pleading.

32.     In *Deckers Outdoor Corp. v. Next Step Group, Inc.*, No. 1:23-cv-02545 (S.D.N.Y.), Next Step argued that Deckers "rushed to the court to sue Next Step" and "never sent a cease and desist letter." Ex. 7 (Def. Next Step's Opp'n to Deckers' Objections to

Magistrate Judge's Order Entered June 30, 2025, *Deckers Outdoor Corp. v. Next Step Group, Inc.*, No. 1:23-cv-02545 (S.D.N.Y. filed July 28, 2025), ECF No. 146), at 5–6. Next Step also asserted that Deckers produced "a generic document dump that Deckers uses in all its litigations," that "Deckers was hiding the identity of fact witnesses," and that Deckers "designated one witness – in-house counsel –" and did so "on almost every factual issue." Ex. 7 (ECF No. 146), at 10. In that action, Deckers's complaint pleads that the "Classic Ultra Mini Trade Dress is unique and inherently distinctive," is "comprised of the following non-functional elements," and "is non-functional in its entirety." In the complaint, Deckers sets forth the same trade dress definition, labels it "inherently distinctive" and "non-functional," and seeks forward-looking injunction terms keyed to that definition. The definition functions as a private rulebook: it signals to competitors and sales channels that the claimed features are off-limits before any protectability ruling. *See* Ex. 8 (Compl., *Deckers Outdoor Corp. v. Next Step Group, Inc.*, No. 1:23-cv-02545 (S.D.N.Y. filed Jan. 25, 2023), ECF No. 1), at ¶¶ 37–39.

33.    The reuse shows up in the vocabulary. Deckers repeatedly defines different products using the same descriptors, including "brushed suede-like exterior," "furry" or "shearling" lining, a "rounded dome-shaped toe," a "center seam," and "thick" outsoles. *See, e.g.*, Ex. 9 (Compl., *Deckers Outdoor Corp. v. Five Below, Inc.*, No. 2:20-cv-11349 (C.D. Cal. filed Dec. 15, 2020), ECF No. 1), at ¶ 20; Ex. 10 (Compl., *Deckers Outdoor Corp. v. A AO et al.*, No. 1:25-cv-13065 (N.D. Ill. filed Oct. 27, 2025), ECF No. 1), at ¶ 17.

34.    The modularity is visible when Deckers moves from one product to the next. In its pleaded "Tazz" definition, Deckers lists five "non-functional elements" including an embroidered braid at the opening, a raised center seam, a rounded dome-shaped toe, a brushed suede-like exterior, and a thick platform outsole. *See* Ex. 10 at ¶ 17. In its pleaded "Tasman" definition, Deckers reprises the same core descriptors, including the braid, center seam, dome-shaped toe, and brushed suede-like exterior, and swaps the outsole term from "platform" to "flat." *See* Ex. 5 at ¶ 17.

35.    Deckers also conclusorily treats comfort-driven traits as "non-functional," including outsole thickness and toe shape, even though those traits are more closely aligned with cushioning, insulation, traction, comfort, and fit in winter comfort footwear. Deckers' own testimony reflects that no substantive review of common functional elements shared by other products takes place before it files trade dress complaints. Deckers's corporate representative and in-house counsel, Lisa Bereda, testified that Deckers evaluates its own sales, marketing, PR, press, social media, and celebrity usage, and does not evaluate what other products are in the marketplace when deciding whether to assert unregistered product-design trade dress. Ex. 11 (Bereda Dep., Jan. 6, 2021, *Deckers Outdoor Corp. v. Wal-Mart Stores, Inc. et al.*, No. 2:20-cv-09521-FLA (AFMx) (C.D. Cal.), ECF No. 184-4), at 23:24-28-2.

36.    Many matters end before any merits-stage decision on whether Deckers' asserted trade dress is protectable, including defaults, agreed injunctions, and confidential settlements. Deckers then cites outcomes and negotiated recitals as practical leverage in later disputes, treating them as if they validate the same template definitions against the next wave of competitors. The program operates as a litigation tax in a seasonal market. Competitors face immediate legal spend, accelerated motion practice, broad discovery, and expert expense on a selling-season clock, and they must choose between absorbing that burden and channel risk or accepting forward-looking restraints.

### C.    *Why Unregistered Trade Dress Is a Preferred Tool*

37.    In sworn testimony, Deckers' in-house counsel Lisa Bereda stated Deckers opted to assert trade dress only (as opposed to design patent) in an enforcement effort because it "offered a broader scope of protection" and could "capture more" competing products, while design-patent claims would increase costs and complexity, including expert expense. Ex. 12 (Decl. of Lisa Bereda, Dec. 30, 2016, *Deckers Outdoor Corp. v. Romeo and Juliette, Inc. et al*, No. 2:15-cv-02812-TJH-PLA (C.D. Cal.), ECF No. 111), at ¶ 11.

38.     Bereda's testimony describes the advantage Deckers sought. Trade dress lets Deckers claim a wider set of competing designs than a time-limited design patent and lowers Deckers' litigation costs when the validity fight shifts into later stages where discovery and experts drive cost and timing. The trade dress definition alleged in the pleading is the mechanism. It supplies the asserted boundary, frames the accusation, and supplies the terms that would define any forward-looking injunction. Deckers chose this route even after the USPTO refused trade dress registration of key UGG product designs and after the first merits-stage test in this campaign rejected protectability for two asserted product-design trade dresses.

### D.     *Deferral-to-Discovery Business Model*

39.     Deckers' litigation strategy depends on deferring protectability questions past the pleading stage into discovery, where cost and timing pressures force settlements regardless of merit. Deckers' litigation history makes this strategy explicit.

40.     The court in *Deckers v. Jessica London* confirmed this dynamic. The court held Deckers "sufficiently pled the elements" but deferred "a more-complete submission of evidence and a more-informed consideration of issues bearing on the success of the claim" to later stages. Ex. 13 (Civil Minutes, *Deckers Outdoor Corp. v. Jessica London, Inc.*, No. 2:20-cv-08624-GW (JCx) (C.D. Cal. Feb. 1, 2021), ECF No. 35), at 4. The court refused to consider functionality at the pleading stage and noted it found no published Ninth Circuit or Supreme Court decision assessing trade dress under *Twombly/Iqbal*, observing that Ninth Circuit trade dress decisions "have almost uniformly been decisions on appeals from summary judgment- or trial-related proceedings." *Id.* at 2.

41.     In *Deckers Outdoor Corp. v. A1VPG68YJ5DJCK, et al.*, after two defendants moved to dismiss, arguing the asserted Tazz Trade Dress features (fleece lining, thick soles) are functional and generic, Deckers opposed the motion by arguing these are "question[s] of fact" that must be deferred to a later stage of the case where Deckers can produce additional

evidence. Deckers also argued that determining inherent distinctiveness "requires a finding of fact that is better addressed beyond the pleading stage." *See*, *e.g.*, Ex. 14 (Pl.'s Opp'n to Mot. to Dismiss, *Deckers Outdoor Corp. v. A1VPG68YJ5DJCK, et al.*, Case No. 1:25-cv-09863 (N.D. Ill.) ECF No. 43), at 4-6; *cf. Samara Bros.*, 529 U.S. at 212-13 (product "design, like color, is not inherently distinctive.").

42.    Deckers filed this brief in December 2025—almost two months after the *Quince* Action held the Tasman Trade Dress generic and thus lacks the requisite distinctiveness[2] on summary judgment. Deckers was arguing that protectability of the Tazz Trade Dress (which shares four of five elements with the rejected Tasman definition) cannot be decided at the pleading stage, despite a developed-record ruling that a materially similar trade dress is unprotectable, and that the Tazz Trade Dress is "inherently distinctive" despite the Supreme Court's ruling that product trade dress is never inherently distinctive.

43.    This deferral strategy converts legal deficiencies into economic leverage. By successfully arguing that protectability questions require discovery and expert proof, Deckers imposes minimum six-figure costs on defendants before any court adjudicates whether the pleaded design is functional, generic, or distinctive. For defendants selling lower-cost alternatives with modest profit margins, these costs are prohibitive regardless of the underlying merits.

44.    The *It's Friday* ruling in late 2024 demonstrates the template's vulnerability to threshold scrutiny: when the court evaluated Deckers' product-design trade dress definition at the pleading stage—even after default—the claim failed for lack of precise boundaries and plausible nonfunctionality. *It's Friday*, 2024 WL 5481211, at *6 (S.D.N.Y. Oct. 31, 2024). Deckers' defer-to-discovery argument is designed to avoid that outcome by convincing courts that protectability cannot be decided early, as occurred in *Jessica London* where the court

_____

[2] A generic trade dress "can never meet the distinctiveness element." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998).

deferred evaluation to "a later stage" with "a more complete submission of evidence and more-informed consideration of issues bearing on the success of the claim."

45.    This deferral strategy forces defendants into expensive discovery even when the pleaded features are obviously functional or generic. Deckers' post-*Quince* persistence in this strategy—arguing that materially similar trade dress claims require expensive factual development after a court already rejected them on a developed record—demonstrates that the goal is not to vindicate protectable trade dress rights but to impose process costs that force settlements.

### E.    Foundational Boot Designs and Early Litigation Framing (2008-2010)

46.    The record shows Deckers building two repeatable components early: trade dress boundary-setting by checklist, and a portable Classic-heritage narrative used to supply distinctiveness across different asserted designs. In *Deckers Outdoor Corp. v. Aldo U.S. Inc.*, Deckers defined the "Cardy Trade Dress" in sweeping terms and applied it across multiple knit-button-boot competitors in a single action. *See, e.g.,* Ex. 15 (Am. Compl., *Deckers Outdoor Corp. v. Aldo U.S. Inc.*, No. 08-cv-07289-FFM(x) (C.D. Cal. filed Nov. 3, 2008), ECF No. 33-2), at ¶ 32 (describing the trade dress as "a unique boot having a crochet upper with buttons on the lateral side[.]")

47.    That same year, Deckers pleaded pre-suit leverage in a retailer dispute. In *Deckers Outdoor Corp. v. Bon-Ton Stores, Inc.*, Deckers asserted design-patent claims alongside trade dress theories and alleged it offered Bon-Ton "an opportunity to" cease and Bon-Ton refused. Ex. 16 (Compl., *Deckers Outdoor Corp. v. Bon-Ton Stores, Inc.*, No. CV08-08074 ODW (VBKx) (C.D. Cal. filed Dec. 8, 2008), ECF No. 1), at ¶ 29. In *Bon-Ton*, Deckers alleged the "Kona Trade Dress" and "Locarno Trade Dress" without fixed feature lists, relying on novelty, nonfunctionality, and association with the UGG brand. *Id.*, at ¶¶ 13-18.

48.    Two years later, Deckers shifted to fixed product feature lists. On November 8, 2010, Deckers sued Romeo & Juliette and its owner, pleading multiple asserted trade dresses

through itemized lists. Ex. 17 (Compl., *Deckers Outdoor Corp. v. Tom Romeo et al.*, Case No. 2:10-cv-08489 (C.D. Cal.), at ¶¶ 22-38.) In *Tom Romeo*, Deckers pleaded an expansive Cardy Trade Dress list comprised of styling descriptors, including: (a) exaggerated raised exposed circular stitch pattern on the boot's upper, (b) a license-plate shape on the heel, (c) a raised and rounded dome-shaped toe, (d) a suede heel overlay on the boot's exterior, (e) a brushed suede exterior; (f) a knitted upper and vamp; (g) a thick flat sole, (h) fabric binding; and (i) buttons on the lateral side of the boot. *Id.*, at ¶ 29.

49.    *Tom Romeo* shows Deckers linking "Classic" identity to newer products. Deckers alleged Cardy "achieved instant fame nationwide" because it "incorporates the Classic Trade Dress," allowing consumers to "instantly identify the Cardy boot as a Deckers boot." *Id.,* at ¶ 33. According to Deckers, "The Cardy Trade Dress therefore embodies Deckers's signature Classic Trade Dress, as well as constituting its own unique trade dress." *Id.*, at ¶ 30.

50.    After the 2010 *Tom Romeo* matter, Deckers did not continue asserting "Classic" as a stand-alone trade dress infringement claim. Instead, Deckers used "Classic" as a heritage narrative to support later, model-specific feature lists. Deckers' later sworn submissions repeat the same origin story and use it to supply source association even as Deckers asserts separate, model-specific feature lists as the claimed trade dress. Ex. 18 (Decl. of Lisa Bereda, *Deckers Outdoor Corp. v. Primark US Corp.*, No. 1:23-cv-10233-ADB (D. Mass. filed Dec. 9, 2024), ECF No. 91), ¶ 4. This early progression, from broad descriptions to fixed feature lists paired with a portable Classic-heritage story, set up the later shift to Bailey Button as a repeatable enforcement asset.

### F.    *Bailey Button as the Repeatable Enforcement Asset (Mid-2010s)*

51.    Deckers built its enforcement playbook through the Bailey Button campaign, which unfolded in three distinct phases.

52.    ***Phase One: Patent-only Actions (2010 through 2013)***. Deckers obtained U.S. Design Patent No. D599,999 for the "Bailey Button Single" boot on September 15, 2009, and U.S. Design Patent No. D616,189 for the "Bailey Button Triplet" boot on May 25, 2010.

53.    From 2010 through 2013, Deckers filed at least 21 Bailey Button enforcement actions asserting exclusively design patents over the footwear design or unfair competition claims based on trademark infringement and dilution claims relating to "UGG" and other registered trademarks. During this three-year period, Deckers asserted zero Bailey Button trade dress claims.

54.    Design patents provided statutory presumptions of validity, constructive notice through product marking, willfulness exposure, and preliminary injunction leverage without requiring proof that the Bailey Button product design achieved secondary meaning. Deckers never had to prove that consumers associated the Bailey Button product design with a single source because it was not making trade dress claims.

55.    Settlement instruments from this period reveal a bundling mechanism: defendants sued for Bailey Button patent infringement agreed to permanent injunctions prohibiting infringement of both "Bailey Button Design Patents" and "UGG Classic Trade Dress," even though the operative complaints asserted no UGG Classic trade dress claims. *See, e.g.*, Ex. 19 (Stipulation to Consent Judgment, *Deckers v. JJ Shoes*, No. 2:14-cv-01099-GW (C.D. Cal. Apr. 29, 2014), ECF No. 15), at ¶¶ 2–5; Ex. 20 (Order re Consent Judgment, *Deckers v. Bright Trading*, No. 2:14-cv-00198-JAK (C.D. Cal.), ECF No. 42), at ¶¶ 3–5.

56.    The bundling worked as follows: Deckers sued on patents it held. Defendants faced statutory infringement exposure. To settle, defendants agreed to injunctions covering trade dress Deckers had not asserted and could not prove protectable. Deckers accumulated market restraints without proving the underlying trade dress rights existed.

57.    ***Phase Two: the Rue21 Strategic Pivot (December 2013 to October 2014)***. The patent enforcement strategy collapsed when a court permitted a patent validity challenge to

proceed. On August 28, 2013, Deckers sued Rue Services Corp. d/b/a Rue21 for patent infringement of the Bailey Button Design Patents. Rue21 answered and counterclaimed for declaratory judgment of patent invalidity, alleging that U.S. Patent Nos. D599,999 and D616,189 are invalid. Deckers then moved to dismiss Rue21's patent invalidity counterclaim under Rule 12(b)(6).

58.    On December 23, 2013, the court denied Deckers' motion to dismiss. The court found Rue21's invalidity counterclaim sufficiently pled and explained that "Deckers is currently on notice that Rue21 plans to challenge the validity of its design patents." Ex. 21 (Civil Minutes, *Deckers v. Rue Services Corp.*, No. 2:13-cv-06303-JVS (C.D. Cal. Dec. 23, 2013), ECF No. 28), at 1, 3.

59.    Sixteen days later, on January 8, 2014, Deckers filed its first Bailey Button trade dress complaint against Styles for Less. Ex. 22 (Complaint, *Deckers Outdoor Corp. v. Styles For Less, Inc*, No. 2:14-cv-00166-CAS (C.D. Cal. Jan. 8, 2014), ECF No. 1).

60.    The timing was not coincidental. Deckers pivoted to trade dress precisely when its patent enforcement strategy faced its first serious validity challenge. Trade dress required no registration and shifted the burden to defendants to prove functionality, genericness, or lack of secondary meaning through expensive discovery and expert testimony.

61.    ***Phase Three: Template Explosion and Systematic Deployment (2014-Present).*** Within weeks of the *Rue21* denial and Deckers' first Bailey Button trade dress action, Deckers filed ten additional complaints using identical Bailey Button trade dress language:

o    Ex. 23 (Compl., *Deckers Outdoor Corp. v. Bright Trading Corp.*, No. 2:14-cv-00198 (C.D. Cal. filed Jan. 9, 2014), ECF No. 1).

o    Ex. 24 (Compl., *Deckers Outdoor Corp. v. JLJ Footwear, Inc.*, No. 2:14-cv-00202 (C.D. Cal. filed Jan. 9, 2014), ECF No. 1).

o Ex. 25 (Compl., *Deckers Outdoor Corp. v. P & Juss, Inc., et al.*, No. 2:14-cv-00205 (C.D. Cal. filed Jan. 9, 2014), ECF No. 1).

o Ex. 26 (Compl., *Deckers Outdoor Corp. v. ZW Shoes, Inc., et al.*, No. 2:14-cv-00207 (C.D. Cal. filed Jan. 9, 2014), ECF No. 1).

o Ex. 27 (Compl., *Deckers Outdoor Corp. v. Bella Shoes Import Inc., et al.*, No. 2:14-cv-00193 (C.D. Cal. filed Jan. 9, 2014), ECF No. 1).

o Ex. 28 (Compl., *Deckers Outdoor Corp. v. Dooballo Footwear, Inc., et al.*, No. 2:14-cv-00695 (C.D. Cal. filed Jan. 29, 2014), ECF No. 1).

o Ex. 29 (Compl., *Deckers Outdoor Corp. v. Jeans Warehouse Inc., et al.*, No. 2:14-cv-00706 (C.D. Cal. filed Jan. 29, 2014), ECF No. 1).

o Ex. 30 (Compl., *Deckers Outdoor Corp. v. Eurostar Inc.*, No. 2:14-cv-00702 (C.D. Cal. filed Jan. 29, 2014), ECF No. 1).

o Ex. 31 (Compl., *Deckers Outdoor Corp. v. JJ Shoes, et al.*, No. 2:14-cv-01099 (C.D. Cal. filed Feb. 12, 2014), ECF No. 1).

o Ex. 32 (Compl., *Deckers Outdoor Corp. v. Sunny Ait Inc., et al.*, No. 2:14-cv-01103 (C.D. Cal. filed Feb. 12, 2014), ECF No. 1).

62.     Within five years of the *Rue21* denial, Deckers rolled out a standardized template across approximately 100 lawsuits as to the Bailey Button design alone. Ex. 33 (Garcia Decl., *Deckers Outdoor Corp. v. Gap, Inc.*, No. 2:17-cv-04922-GW (JPRx) (C.D. Cal. filed Aug. 22, 2018), ECF No. 42-3), ¶ 5. The template reduced Bailey Button to a reusable five-element definition deployed with word-for-word identical language:

(a) Classic suede boot styling made famous by the UGG brand;

(b) Overlapping of front and rear panels on the lateral side of the boot shaft;

(c) Curved top edges on the overlapping panels;

(d) Exposed fleece-type lining edging the overlapping panels and top of the boot shaft; and

(e) One or more buttons (depending on the height of the boot) prominently featured on the lateral side of the boot shaft adjacent the overlapping panels.

*See*, *e.g.*, Ex. 23 (*Bright Trading* Compl. ¶ 13); Ex. 24 (*JLJ Footwear, Inc.* Compl. ¶ 13) (identical paragraphs).

63.     As of at least January 22, 2026, UGG stopped selling the Bailey Button boot on its website. The product page can only be found by direct link and now states, "This Product is Unavailable."

64.     Deckers continues to assert Bailey Button trade dress rights even after the last design patent expired in May 2024. U.S. Patent No. D599,999, issued September 15, 2009, expired September 15, 2023. U.S. Patent No. D616,189, issued May 25, 2010, expired May 25, 2024.

65.     Deckers filed new trade dress claims for Bailey Button as recently as May 2025. Ex. 34 (Compl., *Deckers Outdoor Corp. v. Fashion Nova LLC*, No. 2:25-cv-04214-SVW-JC, (C.D. Cal. filed May 9, 2025)). While Deckers offloads the product from the UGG website and the patents have lapsed, it keeps market restraints in place using unregistered trade dress lawsuits.

### G.     *Scaling the Trade Dress Campaign to Slippers and Slides (2020 through 2021)*

66.     Deckers' in-house counsel Bereda attested that the Fluff Yeah Slide, created decades later, was an extension of the UGG "Classic" boot identity. She further testified that although the brand became well-known for the Classic boot, it worked to reposition UGG from a seasonal footwear brand to a broader "lifestyle brand," and it identifies the Fluff Yeah Slide, launched in 2018, as integral to that repositioning. Ex. 35 (Decl. of Lisa Bereda, Mar. 12, 2022, *Deckers Outdoor Corp. v. Wal-Mart, Inc.*, No. 220-cv-09521-FLA-E (C.D. Cal.), ECF No. 64-4), at ¶¶ 4-5, 13-17.

67.     Bereda confirmed Deckers designed the Fluff Yeah to be "the UGG version of the Gucci fur-lined loafer" aimed at younger, fashion-forward consumers. This admission

exposes a critical flaw in Deckers' case: Deckers relies entirely on its Classic-heritage identity to signal source association, yet attempts to protect an ever-shifting, model-specific feature list as its claimed trade dress. Ex. 11 (Bereda Dep., Jan. 6, 2021, *Deckers Outdoor Corp. v. Wal-Mart Stores, Inc. et al.*, No. 2:20-cv-09521-FLA (AFMx) (C.D. Cal.), ECF No. 184-4), 66:3–9.

68.    Deckers defines Fluff Yeah through a static six-part definition: (1) "a slipper and sandal combined into a statement shoe made famous by the UGG® brand," (2) "a platform, sling back slide," (3) "a platform sole with a furry footbed and furry perimeter sides," (4) "a wide vamp having a furry exterior," (5) "an open toe," and (6) "an elastic heel strap extending from one side of the vamp to the other." Ex. 9 (Compl., *Deckers Outdoor Corp. v. Five Below, Inc.*, No. 2:20-cv-11349 (C.D. Cal. filed Dec. 15, 2020), ECF No. 1), at ¶¶ 12, 20.

### H.    Neumel, Classic Ultra Mini, Tasman, Tazz, As Modular Enforcement Assets (2020-present)

69.    Deckers treats the Neumel chukkas as part of the same campaign by defining the "UGG Neumel Trade Dress" through construction and styling descriptors for an ankle-height boot. Ex. 8 (Compl., *Deckers Outdoor Corp. v. Next Step Group Inc.*, No. 1:23-cv-02545 (S.D.N.Y. filed Jan. 25, 2023), ECF No. 1), at ¶¶ 23-25.

70.    Similarly, Deckers pleads "Classic Ultra Mini Trade Dress" as a laundry list of functional, common footwear construction elements: (1) an ankle-height boot, (2) classic suede boot styling, (3) an exaggerated, raised and exposed circular stitch pattern, (4) exposed tufting, (5) a raised and rounded vamp, (6) a suede heel overlay on the boots exterior, (7) fabric binding along the top of the boot and along the sole, (8) a back pull tab attached to the heel counter at the top of the boot shaft, and (9) a top line that is higher in the front and lower in the back. Ex. *Id.* at ¶ 23.

71.    Deckers also expanded the template into the "Tasman Trade Dress" and "Tazz Trade Dress" using similar feature sets and the same labels. *See, e.g.,* Ex. 10.

72.     In all of these trade dress actions, Deckers pleads the trade dresses verbatim across complaints and labels them "unique," "inherently distinctive," and "non-functional in its entirety," including an embroidered braid at the topline, a raised and prominent center seam, a rounded dome-shaped toe, a brushed suede-like exterior, and a thick, flat outsole. And Deckers pleads secondary meaning through a templated narrative that relies on UGG brand-level advertising and general sales assertions rather than allegations directed to consumer perception of this five-part definition.

73.     Even the post-October 2, 2025 complaints do not narrow the pleaded definition or plead a materially new, feature-directed basis for distinctiveness. After the court's ruling in the *Quince* Action on October 2, 2025, Deckers filed new actions asserting the exact five-feature Tasman definition the *Quince* Action held generic and unprotectable and sought injunctive relief on that basis. Deckers has filed at least forty such pleadings. *See* Ex. 4.

V.    **NOTICE OF DEFINITIONAL, EVIDENTIARY, AND MERITS DEFECTS IN DECKERS' UNREGISTERED PRODUCT-DESIGN TRADE DRESS CAMPAIGN**

74.     By the time Deckers filed the trade dress suits challenged here, Deckers had been told from multiple independent sources that its campaign rests on recurring defects, including but not limited to its complaints' loose trade dress definitions and a proof model that relies on brand fame instead of design-specific consumer perception. The USPTO refusals put Deckers on written notice: product design is not inherently distinctive, commercial success and brand promotion do not show consumers view the design as a mark, and widespread third-party use undercuts exclusivity claims. Deckers used the same model anyway.

A.    *USPTO Record Notice*

75.     Deckers twice tried to register the "Classic" UGG boot product design as trade dress. In those applications, Deckers submitted extensive acquired-distinctiveness materials, including surveys, expert reports, marketing records, sales data, and declarations. Deckers

knew what the USPTO would demand: proof tied to consumer perception of the design, not generalized brand recognition.

76.     **Trademark Application Serial No. 86601266 (filed April 17, 2015).** Deckers filed Serial No. 86601266 seeking to register a three-dimensional product design of its classic UGG boot.

77.     On June 18, 2015, the USPTO refused registration because the mark is product design and therefore not inherently distinctive, and required Deckers to prove acquired distinctiveness under Section 2(f) of the Lanham Act. Ex. 36, (Excerpted TSDR File Wrapper for Trademark Application, Office Action dated June 18, 2015 (Serial No. 86601266)), at 40-42. The examiner emphasized that "a product design can never be inherently distinctive as a matter of law; consumers are aware that such designs are intended to render the goods more useful or appealing rather than identify their source." *Id.* at 40.

78.     The USPTO issued a Request for Information requiring Deckers to address origin and exclusivity, including whether the design "originate[d]" with Deckers, whether it reflected an "original Australian design," and what Deckers did to promote the claimed design features. *Id.*, at 42. The USPTO also identified third-party highly similar boot designs, including designs available before Deckers' asserted promotion period, undermining substantially exclusive use and acquired distinctiveness in the claimed feature set. *Id.*, at 42-43.

79.     The USPTO required Deckers to amend the mark description and supply formalities. *Id.*, at 41-42. Deckers did not obtain registration of Serial No. 86601266.

80.     **Trademark Application Serial No. 87310138 (filed January 23, 2017).** On January 23, 2017, Deckers filed Serial No. 87310138 seeking to register a revised version of the same classic boot design. Ex. 37 (Excerpted TSDR File Wrapper for Trademark Application (Serial No. 87310138)), at 1. The USPTO again refused registration and later

issued a final refusal, requiring Deckers to prove acquired distinctiveness tied to the specific

design claimed and to clarify and narrow the drawing and description. Ex. 37.

81.    In the final refusal, the USPTO rejected Deckers' reliance on sales and

promotion as proof of acquired distinctiveness for the claimed configuration: "Applicant's

extensive sales and promotion may demonstrate the commercial success of applicant's goods,

but not that relevant consumers view the matter as a mark for these goods," citing case law

dating back to 1991 to 2000. *Id.*, at 12 (citing *In re Boston Beer Co.*, 198 F.3d 1370, 1371-73,

53 USPQ2d 1056, 1057-58 (Fed. Cir. 1999); *In re Busch Entm't Corp.*, 60 USPQ2d 1130,

1132-34 (TTAB 2000); *In re Pennzoil Prods. Co.*, 20 USPQ2d 1753, 1757-58 (TTAB 1991)).

The USPTO further concluded that the particular claimed features of the mark "are so

pervasive in the footwear industry that they fail to serve as a designator of source." *Id.*, at 19.

The examiner further stated that "the substantial evidence of record shows that giving

applicant an exclusive right to use this product configuration would tilt the competitive field in

the direction of the applicant and stifle competition." *Id.*, at 20.

82.    In other words, the USPTO told Deckers in writing that product-design trade

dress is not proven by brand halo. It is proven, if at all, by evidence that buyers treat the

claimed feature set as a source identifier, and that the features are not ubiquitous in the market.

### B.    Bootstrapping: Using Settlements as Protectability "Proof"

83.    Deckers also tried to turn settlements and consent-judgment packages into

"proof" of exclusivity. In at least some matters, Deckers used "UGG Classic Trade Dress"

language and a defined feature list in settlement and injunction instruments in ways that

reached beyond the product design asserted in the operative complaint. For example, in the

*Bright Trading* matter, the court-entered consent judgment resolves claims tied to the Bailey

Button Boot Trade Dress and Bailey Button design patents, but it separately defines "UGG

Classic Trade Dress" and includes "UGG Classic Trade Dress" within the scope of the

permanent injunction, framing the restraint as Classic-boot exclusivity even when the operative complaint asserted a different trade dress.

84.    Deckers then cited those settlement instruments to the USPTO as proof that it had successfully enforced its trade dress rights to secure substantial exclusivity in the Classic boot configuration, pointing to lawsuits, consent judgments, and settlement agreements in which competitors allegedly acknowledged those rights or agreed to change product elements. Ex. 36 at 7-37. Deckers presented that enforcement record through declarations from Thomas Garcia, one of its in-house counsel responsible for UGG brand enforcement, and framed settlements and consent judgments as competitor acknowledgments and as evidence of substantial exclusivity and secondary meaning. *Id.* at 5-6.

85.    Those agreements were drafted to generate record-ready acknowledgments. One agreement recites that the "UGG Classic Trade Dress" is "non-functional," "associated with a single source," and "valid and enforceable," and includes a covenant not to challenge validity, and imposes confidentiality. *Id.* at 33. These are negotiated recitals, not merits adjudications.

### C.    *Notice on Definition, Discipline, and Protectability Predicates*

86.    The USPTO required Deckers to tie acquired distinctiveness to a bounded design claim. Courts demanded the same discipline in pleading. In *Fortune Dynamic*, the court held that Deckers' Bailey Button trade dress definition did not adequately articulate boundaries. *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSX), 2015 WL 12731929, at *3 (C.D. Cal. May 8, 2015). The court found Deckers' first listed element, "classic suede boot styling made famous by the UGG® brand," "too general to give Defendants notice" of the claimed trade dress. *Id.*

87.    The court characterized Deckers' nonfunctionality allegations as "conclusory" and explained that a plaintiff must allege how the pleaded trade dress is nonfunctional, particularly where specific pleaded features can serve utilitarian purposes. Courts have

consistently required this showing at the pleading stage. *See Kellytoy Worldwide, Inc. v. Hugfun Int'l, Inc.*, No. 19cv0765, 2019 WL 8064073, at *5 (C.D. Cal. Dec. 4, 2019). On secondary meaning, the court reiterated that the required association is a consumer "mental association" between the alleged trade dress and "a single source," not generalized goodwill associated with "high-quality goods generally." *Fortune Dynamic*, 2015 WL 12731929, at *5. The court found Deckers "never alleges that when consumers see an item of footwear exhibiting the Bailey Button Boot Trade Dress, they associate the item with Plaintiff," and held that Deckers did not plausibly plead secondary meaning for the trade dress as defined. *Id.* at *5.

88.     In *Deckers Outdoor Corp. v. Gap, Inc.*, the court again addressed Deckers' Bailey Button element list and found Deckers' identification overbroad in light of contradictions between the pleaded elements and the photographs Deckers attached. Ex. 38 (Civil Minutes, No. CV 17-04922-GW (JPRx) (C.D. Cal. Nov. 13, 2017)), at 8. Gap's brief also put Deckers on notice that "the boundaries of trade dress must be carefully circumscribed" to prevent improper extension of patent monopolies, citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) and McCarthy on Trademarks. Ex. 39 (Gap's Reply to Motion to Dismiss, ECF No. 23), at 12.

89.     In *Deckers Outdoor Corp. v. Target Corp.*, No. 2:19-cv-06215-RGK (C.D. Cal.), Target moved for judgment on the pleadings, arguing that "Courts are especially hesitant to extend trade dress protection to product designs such as a sandal (as opposed to word marks or even product packaging) because such rights create a monopoly in the goods themselves," citing *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002) and *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001). Ex. 40 (Mot. for Judgment on the Pleadings, ECF No. 85), at 4, 15. Before the court issued a ruling on Target's motion, Deckers settled the case.

90.     These rulings and filings put Deckers on notice that its template approach would not survive scrutiny.

91.     Yet Deckers also learned it could survive pleading challenges through deferral. *See supra* ¶¶ 39-43. This deferral dynamic is central to Deckers' strategy: file template complaints that survive dismissal, force defendants into expensive discovery, then settle before any court examines protectability.

### D.     Sworn Testimony and Discovery Notice of Proof Mismatch

92.     *Fortune Dynamic* drew a distinction that recurs throughout the record. Brand goodwill and general "high-quality goods" associations do not substitute for allegations that consumers associate the specific product design, as defined by the pleaded features, with a single source. Deckers received additional notice through sworn testimony that key pleaded phrases could not be applied as objective criteria.

93.     In the *Primark* litigation, Deckers' Rule 30(b)(6) designee, Lisa Bereda, could not identify defining characteristics for phrases in Deckers' feature list, including "classic suede boot styling" and "exposed tufting." Ex. 41 (Def.'s Mem. in Supp. of Mot. for Summary Judgment., *Deckers Outdoor Corp. v. Primark US Corp*., No. 1:23-cv-10233-ADB (D. Mass. Sept. 4, 2024), ECF No. 60), at 13. The testimony highlighted a gap in identifying a commercial embodiment and identifying the asserted trade dress as pleaded. This put Deckers on notice that its own feature-list phrases were not being used as bounded, feature-based criteria, undermining any reasonable expectation of proving protectability.

### E.     Notice of Templating, Improper Proof Models, and Pressure Remedies in the Litigation Record

94.     In fully contested matters involving sophisticated brand defendants, those defendants sought declarations that the asserted product designs were not protectable trade dress and alleged the designs were functional or lacked secondary meaning. Deckers disputed those challenges and maintained that the asserted designs were nonfunctional, source-

identifying, and recognized by consumers. Defendants also repeatedly argued that Deckers' protectability allegations were templated rather than product-specific, and that Deckers relied on generalized promotion and sales assertions instead of feature-directed proof.

95.    In *Deckers Outdoor Corp. v. JustFab*, the Rule 12(b)(6) motion asserted that Deckers filed "over 100" nearly identical complaints that reused boilerplate allegations and the same five-part Bailey Button feature list, with defendant-specific facts largely confined to a short section. Ex. 42 (Def. Mot. to Dismiss, *Deckers Outdoor Corp. v. JustFab Inc. et al.*, No. 2:15-cv-07023-DMG-FFM (C.D. Cal. Nov. 6, 2015), ECF No. 13), at 7. In *Deckers Outdoor Corp. v. Torrid*, Torrid similarly argued that Deckers' nonfunctionality allegations were pulled word-for-word from prior pleadings involving different UGG footwear. Ex. 43 (Def. Mot. to Dismiss, *Deckers Outdoor Corp. v. Torrid, LLC et al.*, No. 2:22-cv-05551-FWS-DFM (C.D. Cal. Nov. 14, 2022), ECF No. 16), at 8.

96.    Across multiple jurisdictions and years, Deckers reused materially similar brand-history paragraphs, including a 2000 Oprah "Favorite Things" paragraph and celebrity references, to support distinctiveness and secondary meaning. In those pleadings, Deckers tied the asserted "Bailey Button Boot Trade Dress" to a fixed five-feature list beginning with "classic suede boot styling made famous by the UGG® brand," followed by standardized nonfunctionality and secondary-meaning allegations relying on brand-wide fame.

97.    Deckers also repeatedly sought the same pressure-oriented remedies, including broad injunctions extending to "any designs confusingly similar," recall and destruction provisions, and sworn compliance reports. On information and belief, Deckers knew that these repeated pleadings and remedy demands were being described as copy-and-paste trade dress enforcement untethered to product-specific analysis, yet Deckers continued using the same templates.

*F.*     ***The Recent Quince Merits Ruling and Post-Ruling Persistence***

98.     The notice described above was tested in the *Quince* Action. On October 2, 2025, the Court held, on Quince's motion for partial summary judgment, that the asserted Tasman Trade Dress and Classic Ultra Mini Trade Dress are generic and unprotectable. The Court also denied Deckers summary judgment after concluding Deckers did not carry its burden on nonfunctionality.

99.     After that ruling, Deckers continued to file and maintain actions asserting the same five-feature Tasman definition and seeking forward-looking restraints keyed to that definition. *See* Ex. 4 (Post-*Quince* Lawsuits from Lex Machina Search). Deckers also asserted a near-parallel five-feature "Tazz® Trade Dress" definition in post-Quince complaints, reflecting modular reuse of materially similar feature sets. *See, e.g.,* Ex. 44 (Compl., *Deckers Outdoor Corp. v. A1Q8VDQXBCJ531 et al.*, No. 1:26-cv-00204 (N.D. Ill. Jan. 8, 2026), ECF No. 1), at 5-6.

100.     The *Quince* merits ruling supplied the first developed-record test of these product-design trade dress theories. Deckers' decision to refile the same Tasman feature list afterward confirms persistence in a known-rejected definition rather than a product-specific effort to prove protectability. Deckers' continued use of the same rejected definitions after the *Quince* ruling confirms the campaign operates to impose litigation costs and channel disruption, not to vindicate valid trade dress rights.

## VI.     SHAM PETITIONING

101.     Deckers' baseless threats and lawsuits constitute sham petitioning under the *Noerr-Pennington* exception. Litigation is sham where it is objectively baseless and pursued with subjective intent to use the process itself, rather than a favorable outcome, to interfere with competitors. Objective baselessness exists where the petitioner lacked probable cause—meaning it could not reasonably believe the claim would succeed after routine pretrial discovery.

### G.    Objective Baselessness

102.    Deckers lacked probable cause to believe its unregistered product-design trade dress claims could succeed on a developed record. Deckers had received written notice that its model relied on brand-level promotion and ubiquitous construction descriptors rather than evidence of design-specific consumer perception. Product-design trade dress requires proof that the asserted feature-defined design is nonfunctional, is not generic, and has acquired distinctiveness such that consumers associate the specific design features with a single source.

103.    The USPTO twice refused registration, finding that Deckers' advertising "does not tout the design" but instead promotes the UGG brand generally, and that the claimed features were "so pervasive in the footwear industry that they fail to serve as a designator of source." (*See* Section V.A.)

104.    Federal courts required definitional discipline and product-specific allegations, finding Deckers' feature-list boundaries "too general" and protectability allegations "conclusory." (*See* Section V.B.) The *It's Friday* default inquest confirmed this risk: when a court performed threshold scrutiny, Deckers' product-design trade dress claim failed for lack of precise scope and plausible nonfunctionality. Deckers' corporate witness could not define key terms in its pleaded feature lists. (*See* Section V.C.)

105.    The three-year patent-only phase provides direct evidence of objective baselessness. From 2010 through 2013, Deckers filed 79 total enforcement actions, predominantly trademark cases, but asserted only patent claims in 21 Bailey Button lawsuits, without a single Bailey Button trade dress claim. Ex. 45 (Lex Machina docket report for cases filed by Deckers Outdoor Corporation from 2010 through 2013). In the subsequent three-year period, Deckers filed 132 lawsuits, including 54 actions asserting unregistered trade dress. Ex. 46 (Lex Machina docket report for cases filed by Deckers Outdoor Corporation from 2013 through 2016). If Bailey Button trade dress were genuinely protectable, Deckers would have asserted those rights from the outset. It did not. Instead, Deckers relied exclusively on patents, which require no showing of secondary meaning. Ex. 47 (same dataset filtered for "trade

dress"). Only after Rue21 challenged patent validity and survived dismissal in 2013 did Deckers pivot to trade dress. The pivot was immediate.

106.    Across its template complaints, Deckers relied on brand-fame narratives and generalized promotion allegations rather than evidence that consumers recognize the pleaded feature set as a source identifier. (*See* Section IV.C and Section V.A.) Despite the cumulative notice spanning a decade, Deckers continued filing the same template complaints and seeking forward-looking restraints keyed to the same feature lists.

107.    Objective baselessness is clearest in Deckers' post-October 2, 2025 conduct. After this Court held the Tasman Trade Dress generic and unprotectable, Deckers filed at least thirty-four new actions asserting the identical five-feature Tasman definition and seeking injunctive relief. Deckers also filed actions asserting a "Tazz® Trade Dress" definition sharing four of five features with the rejected Tasman definition, differing only in the outsole descriptor. No reasonable litigant would refile claims that were adjudicated invalid.

108.    The pre-*Quince* campaign pattern supplies additional evidence. Across hundreds of cases, Deckers repeatedly sought forward-looking restraints keyed to feature lists while cases terminated through defaults, agreed injunctions, or settlements without developed-record protectability adjudications.

### H.    Subjective Intent

109.    Deckers pursued this sham litigation campaign with subjective intent to use the litigation process itself (and not the merits of its claims) to restrain competition. Deckers deployed hundreds of complaints using interchangeable feature lists and boilerplate protectability allegations, filing suit without pre-suit notice rather than identifying the claimed trade dress and providing an opportunity to resolve disputes before litigation. (*See* Section IV.C.)

110.    Deckers served standardized discovery hard-coding the asserted feature list and expanding into product development and channel operations, increasing early-stage costs.

Deckers drafted settlement instruments to include acknowledgments that its trade dress is "non-functional," "valid and enforceable," and "associated with a single source," coupled with no-challenge covenants and confidentiality provisions. These negotiated recitals manufacture exclusivity without merits adjudication. Deckers then cited these settlements as proof in later proceedings.

111.    Deckers' SEC disclosures confirm this campaign targets lawful competition. Deckers warned that failure to enforce claimed IP rights "will allow [its] competitors to sell products that are similar to and directly competitive with [its] products" and that adverse decisions "could lead to intensified competition and a material reduction in [its] sales. . . ." Ex. 48 (Deckers Outdoor Corp., Form 10-K for the Fiscal Year Ended March 31, 2021), at 3.

112.    Deckers' in-house counsel confirmed the strategic calculation underlying the patent-to-trade-dress pivot. In sworn testimony, Bereda stated Deckers chose trade dress over design patents because trade dress "offered a broader scope of protection" and could "capture more" competing products. Ex. 12 (Decl. of Lisa Bereda, *Deckers Outdoor Corp. v. Romeo & Juliette, Inc*. et al., No. 2:15-cv-02812-ODW (CWx) (C.D. Cal. Dec. 30, 2016), ECF No. 111), at ¶ 11.

113.    This testimony proves Deckers understood trade dress as an enforcement weapon, not a source-identification right. A company asserting trade dress because it is "broader" than patents is not protecting legitimate IP. It is using trade dress definitions to claim market territory that patent law (with its examination, expiration, and validity requirements) would not award.

114.    Deckers has been informed by courts that its theories are defective, yet it continues to assert them. *Fortune Dynamic* (May 2015) held that the "classic suede boot styling made famous by the UGG® brand" element was too general to give Defendants notice. *Gap* (Nov. 2017) held that its element list was overbroad and Deckers treated definitions as illustrative rather than binding. *Deckers Outdoor Corporation v. Fortune Dynamic, Inc*. (C.D.

Cal., May 8, 2015, No. CV 15-769 PSG (SSX)) 2015 WL 12731929, at *3; Ex. 39 at 5-6. Despite these rulings, Deckers deployed identical defective language in Classic Ultra Mini complaints (2023), Tasman complaints (2025), Tazz complaints (2025), and Neumel complaints (2025). A reasonable litigant would correct defective pleadings after judicial notice. Deckers instead multiplied them across six product lines, proving consciousness that validity testing would fail.

115.    After this Court's October 2, 2025 merits ruling declaring two Deckers trade dresses generic, Deckers attempted to insulate that ruling from early use by other defendants. In *Next Step*, when the defendant sought to use the *Quince* Action merits ruling to dispose of Deckers' Classic Ultra Mini trade dress claim, Deckers argued the ruling was an "interlocutory order" in a "still-pending case," "has not been incorporated into any final judgment," and therefore "fails the finality requirement for collateral estoppel." Deckers further argued it would be "fundamentally unfair" if "multiple defendants nationwide" could invoke the ruling in the Quince Action "as a litigation shortcut." Ex. 49 (Letter, *Deckers Outdoor Corp. v. Next Step Group, Inc.*, No. 1:23-cv-02545 (S.D.N.Y. filed Feb. 5, 2026), ECF No. 189), at 1–3.

### I.    *Exemplar Matters*

116.    The matters below illustrate the mechanics of Deckers' sham litigation program.

### *Exemplar Matter: Strategic Retreat after Quince*

117.    After the *Quince* Action held the Tasman Trade Dress generic and unprotectable, Deckers continued filing materially indistinguishable complaints using the same five-feature list. Deckers' post-ruling conduct reveals a pattern: file mass complaints, then strategically dismiss defendants who cite the *Quince* ruling before courts can adjudicate protectability.

118.    The *A1VPG68YJ5DJCK* case illustrates this pattern. On August 18, 2025, Deckers sued over 50 defendants alleging infringement of the UGG TAZZ Trade Dress—a

five-feature definition sharing four of five elements with the Tasman definition the *Quince*

Action held generic. *Deckers Outdoor Corp. v. A1VPG68YJ5DJCK et al.*, No. 1:25-cv-09863

(N.D. Ill.) On November 14, 2025, defendant BULV filed an Answer and Counterclaims

citing the *Quince* ruling: "The Northern District of California recently granted summary

judgment against Deckers on materially similar UGG trade dress claims ... on genericness

grounds." On December 19, 2025, Deckers stipulated to dismiss BULV. Ex. 50 (Answer,

*Deckers Outdoor Corp. v. A1VPG68YJ5DJCK et al.*, No. 1:25-cv-09863 (N.D. Ill. Nov. 14,

2025), ECF No. 37) at 15.

119.    Rather than defend the validity of trade dress claims materially similar to those

already adjudicated generic, Deckers dismisses defendants who challenge protectability,

preserving the template for use against defendants who default or settle.

### Exemplar Matter: Deckers Outdoor Corp. v. It's Friday, Inc., Case No. 1:20-cv-10602 (S.D.N.Y.)

120.    Deckers filed this action on December 15, 2020, asserting trade dress and

trademark claims relating to its "Yoga Sling" sandal, without sending any cease-and-desist

letter. Deckers pleaded the "Yoga Sling Trade Dress" through a list of ordinary construction

descriptors for a thong-style sandal, alleging that the features "in combination" constituted the

trade dress.

121.    After default, the magistrate judge held that default does not eliminate the

court's obligation to determine whether the complaint states a viable claim. The court

concluded Deckers' trade dress pleading failed the "precise expression" requirement,

describing it as a "laundry list" of features "with no explanation" of what is distinctive, and

stating photographs do not substitute for precise textual description. *Deckers Outdoor Corp. v.*

*It's Friday, Inc.*, No. 20-CV-10602 (VSB) (BCM), 2024 WL 5481211, at *5 (S.D.N.Y. Oct.

31, 2024), *report and recommendation adopted*, No. 20-CV-10602 (VSB) (BCM), 2025 WL

886882 (S.D.N.Y. Mar. 21, 2025).

122.    The court separately held Deckers failed to plausibly allege nonfunctionality, noting unregistered trade dress carries a statutory presumption of functionality and that many listed elements were "quite obviously functional." *Id.* at *6.

123.    The court recommended dismissal of Deckers' trade dress claims notwithstanding default, but recommended entry of a permanent injunction barring infringement of Deckers' unregistered YOGA SLING word mark.

### Exemplar Matter: Deckers Outdoor Corp. v. Tommy Hilfiger Retail, LLC, et al, 2:22-cv-04273-MWF-GJS (C.D. Cal.)

124.    In June 2022, Deckers sued Tommy Hilfiger Retail and PVH Corp., a sophisticated multi-billion-dollar fashion conglomerate, asserting infringement of an unregistered Fluff Yeah product-design trade dress. Deckers pleaded the trade dress as "unique" and "inherently distinctive," defining it through six "non-functional elements" including "a slipper and sandal combined into a statement shoe made famous by the UGG® brand."

125.    Deckers defined the "Fluff Yeah Trade Dress" through six "non-functional elements": (a) "a slipper and sandal combined into a statement shoe made famous by the UGG® brand," (b) "a platform, sling back slide," (c) "a platform sole with a furry footbed and furry perimeter sides," (d) "a wide vamp having a furry exterior," (e) "an open toe," and (f) "an elastic heel strap," alleging the composite "is non-functional in its entirety" and features "serve only" to identify goods from Deckers.

126.    Tommy Hilfiger and PVH contested protectability and sought declaratory relief. They expressly denied the asserted trade dress is "inherently distinctive" and denied Deckers' listed elements are "non-functional." Ex. 51 (Answer, *Deckers Outdoor Corp. v. Tommy Hilfiger Retail, LLC*, No. 2:22-cv-04273-MWF-GJS (C.D. Cal. Oct. 14, 2022), ECF No. 15) at 5.

127.    The action terminated by stipulated dismissal on February 24, 2023, without any merits adjudication of protectability.

***Exemplar Matter: Deckers Outdoor Corp. v. Jessica London et al, Case No. 2:20-cv-08624 (C.D. Cal.)***

128.    After Jessica London moved to dismiss, the court denied the motion on February 1, 2021, accepting the complaint's allegations as true and leaving evidentiary submissions for a later stage.

129.    The court declined to resolve protectability through judicial notice at the pleading stage. *See* Ex. 13.

130.    The case proceeded into discovery, Deckers added FullBeauty entities through amendment, and the parties filed a stipulated dismissal with prejudice on January 7, 2022.

***Exemplar Matter: Deckers Outdoor Corp. v. Tar's Trading Co., Inc., Case No. 2:15-cv-08972-GW-AJW (C.D. Cal.)***

131.    Deckers filed its complaint in November 2015 asserting unregistered product-design trade dress claims tied to Bailey Button designs, supporting secondary meaning with brand-history, celebrity references, and generalized assertions that Deckers "spends millions of dollars annually" advertising and sold "hundreds of millions of dollars worth" of such products.

132.    Tar's Trading counterclaimed for declaratory relief, alleging the asserted trade dresses were "generic," "functional," not "inherently distinctive," and lacking "secondary meaning."

133.    Deckers filed a notice of settlement in April 2016, and the action was dismissed with prejudice in June 2016 without any merits adjudication of protectability. Ex. 52 (Order Dismissing Action with Prejudice, *Deckers Outdoor Corp. v. Tar's Trading Co., Inc. et al.*, No. 2:15-cv-08972-GW (AJWx) (C.D. Cal. June 13, 2016), ECF No. 27), at 1.

***Exemplar Matter: Deckers Outdoor Corp. v. Steven Madden, Ltd., Case No. 2:24-cv-03131 (C.D. Cal.)***

134.    Deckers pleaded an unregistered "Tazz Trade Dress" defined through a five-feature list and alleged it is nonfunctional, visually distinctive, and source-identifying. Ex. 53

(Compl., *Deckers Outdoor Corp. v. Steven Madden, Ltd. et al.*, No. 2:24-cv-03131 (C.D. Cal. Apr. 16, 2024), ECF No. 1**)** at 7-8.

135.    Steve Madden contested protectability and sought declaratory relief that the asserted trade dress is invalid and lacks secondary meaning.

136.    The parties stipulated to dismissal with prejudice on April 21, 2025, without reaching merits adjudication of protectability.

### Exemplar Matter: Deckers Outdoor Corp. v. Public Desire Limited., Case No. CV 20-7573 (C.D. Cal.)

137.    In *Deckers Outdoor Corp. v. Public Desire Limited*, Case No. CV 20-7573 (C.D. Cal.), Deckers sought default-judgment relief including permanent injunctive relief over the "Fluff Yeah Trade Dress."

138.    The court denied Deckers' initial application, holding the submission relied largely on counsel declaration and did not provide admissible support for requested monetary relief or for equitable predicates for permanent injunctive relief. The court required a renewed application supported by admissible evidence from a competent corporate officer. Ex. 54 (Civil Minutes – General (Order Re: Application for Default Judgment), *Deckers Outdoor Corp. v. Public Desire Limited*, No. 2:20-cv-07573-FMO (GJSx) (C.D. Cal. Feb. 18, 2022), ECF No. 29).

139.    Deckers renewed the application and sought only a permanent injunction. The court denied relief and dismissed without prejudice for lack of personal jurisdiction. Ex. 55 (Civil Minutes – General (Order Re: Application for Default Judgment), *Deckers Outdoor Corp. v. Public Desire Limited*, No. 2:20-cv-07573-FMO (GJSx) (C.D. Cal. Feb. 18, 2022), ECF No. 33).

### Pattern And Inference

140.    These matters demonstrate Deckers' standardized enforcement program: post-*Quince* Tasman refilings show persistence despite merits rejection; *It's Friday* shows

definition and functionality failures even at default; *Jessica London* shows Rule 12 deferral into discovery; *Tar's Trading* and *Steven Madden* show early settlement after trade dress validity counterclaims; and *Public Desire* shows proof and jurisdiction limits in default settings.

141.    In practice, Deckers' feature lists and forward-looking injunction demands operate as private rules for anyone who may sell shearling-lined casual footwear, enforced through litigation cost, timing, and channel disruption rather than merits-tested validity.

142.    The Bailey Button template has been deployed across Deckers' entire product line. Classic Ultra Mini complaints (2023-2025) include identical "classic suede boot styling" language *Fortune Dynamic* rejected in 2015. Tasman, Tazz, and Neumel complaints follow the same pattern. As the defendant in *Primark* pointed out, Deckers "attempts to confuse the asserted Classic Ultra Mini Trade Dress and the overall appearance of the UGG Classic Ultra Mini shoe," focusing on "irrelevant evidence and arguments related to the UGG brand" rather than proving design elements achieved secondary meaning. Ex. 56 (*Deckers v. Primark*, No. 1:23-cv-10233, (D. Mass. Dec. 23, 2024), ECF No. 103), at 7-8. This is the Deckers playbook—narrow elements for notice pleading, broad enforcement using brand fame, settle before validity testing.

## VII.    RELEVANT MARKET AND MARKET POWER

143.    The relevant geographic market in this case is the United States.

144.    The relevant product market is the Sheepskin Casual Footwear Market, the market for sheepskin and shearling-lined casual footwear, including boots, slippers, slides, and sandals, that are designed and purchased primarily for warmth, comfort, and softness, and commonly worn both indoors and outdoors in casual, non-athletic settings.

145.    Deckers itself and others in the industry have described the UGG sheepskin footwear products as "category-defining" for the category of sheepskin casual footwear.

Indeed, in Australia and New Zealand, "ugg" is a generic term describing the overall category of sheepskin footwear.

146.    Products in this market are differentiated by sheepskin or shearling lining material and associated warmth, comfort, softness, and styling attributes that drive purchase decisions and constrain substitution. The market excludes general winter boots and general house shoes that lack sheepskin or shearling lining, and are not marketed, merchandised, or purchased as part of the sheepskin comfort segment suitable for both indoor and outdoor casual use.

147.    For a substantial portion of consumers, ordinary winter boots are not reasonable substitutes. Ordinary winter boots are primarily purchased for outdoor performance—snow resistance, traction, durability, and weather protection. By contrast, sheepskin casual footwear is purchased for comfort, softness, and warmth in low-intensity, casual contexts, including indoor and short outdoor use. The defining characteristic of the relevant market, sheepskin or shearling lining, offers attributes (temperature regulation, moisture control, tactile softness) that consumers actively seek and are willing to pay a premium for. Synthetic-lined or insulated winter boots are not viewed by consumers as reasonable substitutes, even at lower prices. A consumer purchasing sheepskin casual footwear is unlikely to respond to a modest price increase by switching to heavier, stiffer, utilitarian winter boots that are uncomfortable or impractical for indoor or casual wear. As a result, cross-price elasticity between these categories is low.

148.    Similarly, ordinary house shoes are typically designed for indoor use only, lack durable soles, and do not provide the level of insulation, structure, or longevity associated with sheepskin casual footwear. Consumers do not view ordinary house shoes as interchangeable for products intended for both indoor and outdoor use. Consumers purchasing sheepskin casual footwear value versatility, appearance, and comfort and are willing to pay a premium for those attributes. Ordinary house shoes are perceived as a lower-tier product and are not

considered acceptable substitutes for casual outdoor wear. While some sheepskin casual footwear may substitute for house shoes, the reverse is not true. This asymmetric substitution suggests that ordinary house shoes do not discipline prices in the Sheepskin Casual Footwear Market.

149.    Retailers and e-commerce platforms recognize these distinctions, classifying and merchandising products by material and comfort attributes and enabling consumers to search and filter by "shearling," "sheepskin," and related warmth attributes, presenting sheepskin-lined casual footwear as a distinct segment. Consumers likewise search for, evaluate, and compare products within this segment based on lining material, warmth, comfort, and styling.

150.    ***Deckers' Market Power***. Deckers holds substantial market power. Deckers reports UGG net sales of approximately $2.531 billion for fiscal year 2025, including approximately $1.249 billion in direct-to-consumer sales and $1.282 billion in wholesale sales. Ex. 57 (Excerpted Deckers Outdoor Corp., Form 10-K for the Fiscal Year Ended March 31, 2025, at 3 (UGG brand net sales by channel)).

151.    On information and belief, Deckers holds 50% or more market share in the Sheepskin Casual Footwear Market.

152.    Deckers discloses that, at its direction, its manufacturers purchase the majority of the sheepskin used in Deckers' products from only two tanneries in China, which source sheepskin primarily from Australia. Deckers further states that it forecasts sheepskin usage in advance at forward prices and enters into purchasing commitments with suppliers to manage price volatility, reinforcing centralized control over a key input. Deckers' disclosures also acknowledge pronounced seasonality in UGG sales, with a substantial concentration of revenue in the fall and winter quarters. In addition, Deckers describes a global intellectual-property enforcement program and confirms that it routinely initiates and defends intellectual-property litigation, including trade dress actions. In light of Deckers' scale and channel reach,

this enforcement program operates as a private regulatory regime within the sheepskin casual footwear market.

153.    As a result, Deckers has been able to command and maintain supracompetitive pricing that is typically twice as high as its competitors'.

## VIII.  LITIGATION-INDUCED OUTPUT REDUCTION AND COST IMPOSITION

154.    Quince sells high-quality sheepskin casual footwear direct-to-consumer through its website. After Deckers filed the *Quince* Action, Quince removed or modified the accused products to reduce litigation exposure, reducing output and eliminating lawful competitive options in high-demand silhouettes during the relevant season.

155.    Deckers' campaign imposes anticompetitive effects by forcing competitors to bear substantial defense costs and make rapid product, inventory, and design decisions under threat of injunctive relief—deterrent effects that are predictable and amplified in a seasonal market where commitments are made months in advance.

156.    Quince is a direct target of the challenged conduct. Its injuries—reduced output, reduced choice, increased costs from exclusionary conduct targeting competitive supply of demanded designs—are capable of reasonable estimation using business records, including defense costs, redesign costs, inventory write-downs, and lost sales.

157.    Quince satisfies antitrust standing under *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983). Quince's injury is of the type the antitrust laws were intended to prevent: forced withdrawal of competing products and exclusionary litigation costs are direct consequences of Deckers' sham litigation scheme.

158.    Quince is not a remote victim—it is a targeted competitor whose market participation Deckers sought to eliminate. Quince's injury is causally connected to the violation. Deckers sued Quince asserting on generic and unprotectable trade dresses. Quince removed products, incurred defense costs, and modified competitive behavior specifically in response to Deckers' baseless litigation.

## IX.    MECHANISM OF EXCLUSION

159.    ***Barriers to Entry***. Barriers to entry and expansion include seasonal demand concentration, long lead times for product and materials sourcing, need for reliable sheepskin access in a constrained supply chain, and legal risk created by Deckers' litigation campaign.

160.    Deckers amplified these barriers by making market participation legally risky and financially punishing through repeated lawsuits seeking injunctive relief tied to unregistered product-design trade dress assertions.

161.    Deckers' SEC disclosures confirm this campaign targets lawful competition. Deckers does not warn that competitors will sell counterfeits bearing the UGG mark; it warns that competitors will sell products similar to and directly competitive with Deckers' products, precisely the type of healthy competition that the Supreme Court noted that has "salutary effects in many instances" and that "is not always discouraged or disfavored by the laws which preserve our competitive economy." *TrafFix*, 532 U.S. at 30. Deckers' enforcement program is designed to suppress lawful competitive products.

162.    ***Price Effects and Consumer Harm***. Deckers' campaign reduces output and choice and tends to raise prices by increasing rivals' costs and inducing withdrawals. Deckers' sheepskin products are typically priced 50% to 100% higher than competing products.

163.    Quince and other competitors withdrew or modified products in response to Deckers' litigation threats, reducing available competing designs during peak selling seasons.

164.    Consumer choice is restricted because the campaign targets the specific functional features consumers demand most—shearling lining, thick or platform soles, rounded toes, and other comfort-oriented construction attributes. By claiming exclusivity over these common features, Deckers forecloses consumer access to competing products meeting their preferences.

165.    Prices are elevated because Deckers' exclusion of lower-priced competitors removes downward pricing pressure. Deckers' UGG products typically retail between $100-$200, while competing products from Quince and others retail for half of that or less. When

lower-priced alternatives are removed through sham litigation pressure, consumers face narrower choice sets skewed toward Deckers' higher-priced products.

166. The seasonal market amplifies consumer harm. When Deckers' early-stage litigation forces competitors to withdraw products before or during peak season, consumers face immediate reduction in choice during the specific period when they seek to purchase such products.

## FIRST CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act, Attempted Monopolization, 15 U.S.C. § 2)**

167. Quince incorporates by reference all preceding allegations.

168. Deckers engaged in anticompetitive and exclusionary conduct by pursuing a pattern of objectively baseless threats and lawsuits based on unregistered product-design trade dress assertions that are overbroad, not tethered to protectable features, and used to deter lawful competition in common product designs. This conduct raised rivals' costs and reduced output.

169. Deckers acted with specific intent to monopolize, demonstrated by: (1) in-house counsel's sworn testimony that Deckers chose trade dress because it "offered a broader scope of protection" and could "capture more" competing products; (2) Deckers' practice of expanding injunction scope beyond specific accused products to reach "any designs confusingly similar" and even unasserted trade dresses; and (3) SEC filings stating that failing to enforce claimed IP rights "will allow [its] competitors to sell products that are similar to and directly competitive with [its] products" and that adverse decisions "could lead to intensified competition and a material reduction in [its] sales."

170. Specific intent is further shown by the systematic nature of the campaign. Deckers deployed hundreds of template complaints using interchangeable feature lists and boilerplate allegations, coupled with standardized discovery and remedy demands designed to maximize early-stage cost and disruption—a repeatable, industrial-scale approach reflecting a

strategy to use litigation as a competitive weapon. The timing and targeting demonstrate anticompetitive intent. On information and belief, Deckers systematically files most suits at the beginning of fall/winter selling season when competitors have committed to inventory, marketing, and retail partnerships, maximizing disruptive effect. A litigant protecting valid IP rights would provide pre-suit notice; Deckers' file-first approach reflects intent to maximize competitive harm.

171.    On information and belief, Deckers possesses market share exceeding 50% in the relevant market and has used the challenged conduct to eliminate or marginalize competing products from Quince and many others. Each successful enforcement action entrenches Deckers' position by reducing competitors willing to offer competing designs.

172.    The seasonal and commitment-intensive market structure creates structural advantages for exclusionary litigation. Competitors must commit to inventory, production, and marketing months before selling season. A litigation threat during this window—even if baseless—can force withdrawal before consumers see the product, giving Deckers' campaign disproportionate exclusionary effect. Barriers to entry are high and rising. New entrants must secure sheepskin supply that is in high demand and for which there are limited suppliers, secure quality manufacturers with sufficient capability and capacity, develop retail and/or wholesale sales channels, incur marketing and promotion expenses, and bear front-loaded legal risk. Each iteration of Deckers' litigation program raises these barriers.

173.    Quince suffered antitrust injury and damages proximately caused by Deckers' conduct. Those damages include defense costs, lost sales, forced changes to product plans and inventory decisions, and impaired ability to compete on the merits. Quince is entitled to treble damages, attorneys' fees, and costs.

174.    Deckers' challenged conduct is ongoing and threatens continued harm to consumers, to competition, and to Quince. Monetary damages alone are inadequate because

the program operates in real time, disrupts seasonal selling windows, and chills market entry and expansion through the threat of early restraints and continuing litigation.

175.    Quince seeks injunctive relief under 15 U.S.C. § 26 to prevent recurrence and deter further anti-competitive conduct from Deckers, including prohibitions on:

(a)    Filing or maintaining actions asserting the Tasman or Classic Ultra Mini Trade Dress;

(b)    Asserting any of Deckers' product-design trade dresses are "inherently distinctive" in litigation or with threat of litigation.

(c)    Asserting unregistered product-design trade dress(es) in litigation or with threat of litigation without identifying: (i) the specific features alleged protectable; (ii) the specific accused product(s); (iii) the factual, product- or design-specific basis for claiming the feature list is nonfunctional, nongeneric, and has acquired secondary meaning; and (iv) allowing thirty days for response before filing, except where evidence shows deliberate copying or counterfeit goods.

## **PRAYER FOR RELIEF**

Quince respectfully requests that the Court enter judgment in Quince's favor and against Defendant Deckers and order as follows:

(a)    Compensatory, treble, and punitive damages to be proven at trial.

(b)    Attorneys' fees and costs as allowed by law.

(c)    Preliminary and permanent injunctive relief consistent with the narrow relief requested above.

(d)    Prejudgment and post-judgment interest, including under 15 U.S.C. § 15.

(e)    Any such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Quince demands a trial by jury on all issues so triable.

Dated: February 20, 2026

Respectfully submitted,

MORROW NI LLP

By: */s/ Xinlin Li Morrow*
Xinlin Li Morrow

*Attorneys for Plaintiff*